ESTATE OF William L. RENO, Jr.;
Barbara G. Reno, Executrix,
Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–
Appellee,

Virginia Bar Association,
Amicus Curiae.

No. 89–2078.

United States Court of Appeals,
Fourth Circuit.

Argued April 9, 1991.

Decided Sept. 13, 1991.

As Amended Oct. 24, 1991.

James Laurence Malone, III, McDermott, Will & Emery, Chicago, Ill., argued (Richard L. Dees, on brief), for petitioners-appellants.

Teresa Ellen McLaughlin, Tax Div., U.S. Dept. of Justice, Washington, D.C., argued (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, and Jonathan S. Cohen, on brief), for respondent-appellee.

Thomas E. Spahn, C.L. Dimos and Suzanne W. Doggett, McGuire, Woods, Battle & Boothe, Richmond, Va., for amicus curiae.

Before ERVIN, Chief Judge, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, WILKINSON, WILKINS and NIEMEYER, Circuit Judges, and CHAPMAN, Senior Circuit Judge, sitting en banc.

## OPINION

K.K. HALL, Circuit Judge:

Barbara J. Reno, executrix of the estate of her deceased husband, Dr. William L. Reno, appeals an order of the Tax Court upholding a notice of deficiency issued by appellee, the Commissioner of Internal Revenue. We find that Dr. Reno's purported attempt to shift estate taxes from probate to nonprobate assets is impermissible under Virginia probate, property, and tax apportionment law. Accordingly, we reverse.

### I.

### A.

The facts are exhaustively recounted in the opinions of the panel, *Estate of Reno v. Commissioner of Internal Revenue*, 916 F.2d 955 (4th Cir.1991), and will not be repeated here, except where lucidity demands.

No matter how one frames the issue, the law of Virginia supplies the answer. If the issue is how to apportion estate taxes, *Riggs v. Del Drago*, 317 U.S. 95, 63 S.Ct. 109, 87 L.Ed. 106 (1942), instructs us to look to state law. If the issue is whether

the entireties property passed to Barbara Reno outright, thus qualifying it for the marital deduction, we must decide whether Dr. Reno's will could restrict the property's passing outright, and, if so, whether it did.[1] Again the questions invoke state law.

### B.

The fact at the core of this case is Reno's testamentary directive to shield the Kentucky realty from estate tax. The Commissioner hallows this command and pronounces that it must be obeyed, even at the expense of the entireties property. Though we think Reno's actual intent is a debatable question, *see* 916 F.2d at 968 n. 1 (Hall, J., dissenting), we will assume that Reno intended the entireties property to bear some of the estate tax generated by his probate assets. The Commissioner then cites Va.Code § 64.1–165, and concludes that Reno was lawfully able to achieve this burden shifting. We disagree.

The inviolable character of property held by the entireties under Virginia law was described in the dissent to the panel majority opinion:

> A husband may not obligate entireties property or subject it to his debts without the consent of his wife. Consequently, a purported sale or mortgage of the property to which the wife does not consent is ineffective. Furthermore, and most importantly for this case, upon the death of one spouse, fee title simply remains in the other by operation of law. No will is necessary; no reference to the law of intestate succession is necessary. A testator is absolutely powerless to alienate the property from his spouse. Any provisions in the will purporting to do so are necessarily inoperative. "This is so ... because in the first instance [the survivor] took the entirety."

916 F.2d at 969 (citations omitted).

The crushing impact of the Commissioner's construction of § 64.1–165 on these hoary principles of property law, where a construction is available that is fully harmonious with them, casts much doubt on the validity of the Commissioner's position. The aforesaid dissent described the irreconcilable conflict between Virginia laws created by the Commissioner's argument:

> Though a testator is unequivocally forbidden to alienate entireties property by his will, the [Commissioner]'s construction of § 64.1–165 would permit a testator to do the functional equivalent by simply designating his entireties property as the fund from which all estate taxes are to be paid. A surviving spouse who must sell her property to pay estate taxes generated by property devised to others will take no solace in her husband's inability to directly alienate the property.

916 F.2d at 969–970 (footnote omitted).

We think it quite doubtful that the Virginia legislature intended to implicitly repeal centuries-old property and probate law by enacting its tax apportionment statute. Moreover, the language and historical context of the statute, which we develop below, support a construction of the statute that disturbs preexisting law as little as necessary to effect the statute's purposes.

### C.

An administrator or executor in Virginia only controls assets passing through the probate estate, and not nonprobate assets like property held by the entireties. *Johnson v. McCarty*, 202 Va. 49, 115 S.E.2d 915 (1960); *Vasilion v. Vasilion*, 192 Va. 735, 66 S.E.2d 599 (1951). The federal estate tax is imposed upon the executor. I.R.C. § 2002.[2] At common law, without statutory authority to seek contribution from tax-generating nonprobate assets, a Virginia executor had to pay all federal estate taxes from the probate estate, even to the

---

1. The second formulation is probably the better statement of the issue. The marital deduction reduces the "gross estate" to the "taxable estate." I.R.C.

§ 2056(a). Estate taxes are then assessed based on the taxable estate, and the bill is sent to the executor, I.R.C. § 2002, where it is then apportioned according to state law.

2. "Executor" as used in § 2002 includes administrators of intestate estates. I.R.C. § 2203.

point of exhausting it.[3] This situation persisted in Virginia until 1946, when the Virginia apportionment statute was enacted. Va.Code § 64.1–160 *et seq.*

The 1946 act created a new power in the executor to collect estate taxes from nonprobate assets, in "the proportion that the value of the [nonprobate asset] bears to the [gross estate less exemptions, deductions and exclusions]." Va.Code § 64.1–162. The legislature also *preserved* the testator's preexisting right to create his own scheme among his probate assets. We supply emphasis, because the legislature's words are telling:

> [N]one of [the foregoing tax apportionment] provisions shall in any way *impair* the right or power of any person by will ... to make direction from the payment of such estate or inheritance taxes and to designate the fund or funds or property out of which such payment shall be made; and *in every such case the provisions of the will ... shall be given effect to the same extent as if this article had not been enacted.*

Va.Code § 64.1–165.

If the Virginia legislature intended to create a new testamentary power, it chose an exceedingly odd verb to express its design. "Impair" means "to make worse: diminish in quantity, value, excellence, or strength: do harm to: damage, lessen...." Webster's Third New International Dictionary (1976). The legislature was plainly preserving a power, not engendering one.

Its choice of a verb is not the only clue to the legislature's goals, however. It further provided that any attempt by a testator to apportion estate taxes immediately short-circuits the apportionment statute—the testator's will "shall be given effect to the same extent as if this article had not been enacted." Of course, if the article

had not been enacted, the executor could not collect any estate taxes from nonprobate assets; therefore, a will disturbing the apportionment scheme forecloses the executor's power under that scheme to compel contribution from recipients of nonprobate assets. Unambiguous Virginia precedent[4] so holds.

> By charging his [probate] real estate with *any* estate and inheritance taxes and by directing the payment thereof out of the fund created by the sale of his property, the testator fixed the liability for *all* such taxes upon his probate estate.

*Simeone v. Smith,* 204 Va. 860, 134 S.E.2d 281, 284 (1964).

In short, far from being a tacit revolution in probate and property law, § 64.1–165 is just a savings clause—if you don't like the new scheme, you can still use the old. The new scheme provides the executor limited power to collect a proportional share of estate taxes from nonprobate assets; the old provides no collection power at all. Virginia testators lacked the power to assign estate tax liability to nonprobate assets before 1946; they did not acquire such a power from § 64.1–165.

Dr. Reno could have remained silent, and the entireties property would have borne its proportionate share of estate tax, which is zero. Instead, he disturbed the apportionment scheme and thereby affixed liability for all estate taxes on his probate estate; the entireties property's share of tax is still zero.

## II.

The panel majority focused on the marital deduction itself. It argued that Dr. Reno could have made the entireties property "qualify" for the marital deduction,[4]

---

**3.** If the taxes tendered by the executor are insufficient, and he lacks power to collect more, the Commissioner can assert transferee liability against recipients of taxable nonprobate assets. I.R.C. § 6901.

**4.** The marital deduction is generally available only for interests passing without limitation to the surviving spouse. I.R.C. § 2056(b)(1). Where property passes as a probate asset, re-

strictions in the decedent's will (e.g. bequest of a life estate rather than fee) may cause the property to lose its eligibility for the marital deduction. *Baylor v. National Bank of Commerce,* 194 Va. 1, 72 S.E.2d 282 (1952); *Wisely v. United States,* 893 F.2d 660 (4th Cir.1990). However, under Virginia law, absolute title to property held by the entireties remains in the surviving spouse, notwithstanding the futile testamentary

but he failed to do so. 916 F.2d at 960–62. This focus obscures the issues. So, for the sake of illustration, we will abolish the marital deduction.

In this imaginary but plausible [5] world, the entireties property would still be a nonprobate asset, and Reno would still lack the testamentary power to burden it with taxes generated by other assets in his estate. If his will was silent as to apportionment, the entireties property would pay its proportionate share of estate tax. If he exercised the testamentary power preserved to him by § 64.1–165, his executor would be forced to collect tax only from the probate estate; the entireties property could be assessed tax only if there remained a deficiency, and then only by the Commissioner. *See* note 3 *supra.* Once again, neither case results in the entireties property bearing a greater share of tax than it generated itself.

In the real world, many nonprobate assets—gifts includable in the gross estate, insurance benefits, survivorship bank accounts—pass to persons other than a surviving spouse. All are beyond the reach of the testator as a matter of state law; none depends on the existence of a federal deduction for its shelter from the testator's grasp.

Dr. Reno lacked the testamentary power to impose estate taxes generated by the Kentucky realty on the Virginia entireties property, even if he so desired. Therefore, the entireties property passed to appellant without limitation, qualifying it in full for the marital deduction, and removing it in full from the taxable estate. The decision of the Tax Court is reversed.

REVERSED.

attempts of the deceased spouse to alienate it. *Vasilion,* 66 S.E.2d at 602. By that fact alone, it qualifies for the federal marital deduction.

5. Indeed, a miniature version of this scenario was in effect when Reno died. At that time, the marital deduction was limited to the greater of $250,000 or fifty percent of the adjusted gross estate. However, because the value of the entireties property does not exceed fifty percent of Reno's adjusted gross estate, this limitation does not apply here.

MURNAGHAN, Circuit Judge, dissenting:

The panel opinion of the majority in *Estate of Reno v. Commissioner,* 916 F.2d 955 (4th Cir.1990), vacated upon the grant of rehearing *en banc,* expresses in some detail why, from my standpoint at least, the Tax Court was correct and should have been affirmed. Unfortunately, the Court *en banc* has reversed the Tax Court, and I respectfully dissent, limiting my discussion to those points raised by the *en banc* majority's opinion here. There has been an unfortunate attempt to accomplish the incompatible, to merge federal estate tax law concepts with ideas of state tenancy by the entireties, deriving from common law origins when they are not truly operative and cannot satisfactorily mix.

I would agree with that much of the *en banc* majority's holding which reasons, relying on section 64.1–165 of the Virginia Code, that where a testator affirmatively directs apportionment contrary to the statutory scheme, the will provision will be given effect to the extent pre-existing common law permits. Where I part company with the *en banc* majority's ruling is in its perception of the state of the common law as not so permitting.

The common law deals with apportionment of federal estate taxes in the absence or presence of a will provision speaking to the issue. In Reno's case there was present a will provision speaking to the issue. The fundamental flaw in the *en banc* majority's reasoning is its misplaced reliance on principles of the common law of title as to devises and bequests as the only body of law defining the limitations of testamentary apportionment.[1] Had the *en*

1. The dearth of authority in the *en banc* majority's opinion illustrates the point. With the exception of *Riggs v. Del Drago,* 317 U.S. 95, 63 S.Ct. 109, 87 L.Ed. 106 (1942), and two cases cited in a footnote; *Baylor v. National Bank of Commerce,* 194 Va. 1, 72 S.E.2d 282 (1952); and *Wisely v. United States,* 893 F.2d 660 (4th Cir. 1990); none of the authorities cited by the majority has anything to do with testamentary apportionment of federal estate taxes. Moreover, as I shall discuss momentarily, the three cases

*banc* majority pondered or surveyed the state of the common law as it has been shaped by the federal estate tax decisions of the Supreme Court dating back to the 1930's, it should not have ruled the way it has.

As discussed at length in the panel majority opinion, the existing authority on the instant matter in its proper context—federal estate taxation and its apportionment—is as old as its genesis, *Tyler v. United States*, 281 U.S. 497, 50 S.Ct. 356, 74 L.Ed. 991 (1930). There, of course, the Supreme Court upheld the power of Congress to impose federal estate tax on tenancies by the entirety and joint tenancies. Though the argument was made that state tenancy by the entireties law governed to bar the tax, the Supreme Court first observed that tenancy by the entireties was an amiable legal fiction and that taxation is eminently practical. It proceeded readily to uphold the tax, observing,

> Before the death of the husband ... the wife had the right to possess and use the whole property, but so, also, had ,her husband; she could not dispose of the property except with her husband's concurrence; her rights were hedged about at all points by the equal right of her husband. At his death, however, and because of it, she, for the first time, became entitled to exclusive possession, use and enjoyment; she ceased to hold the property subject to qualifications imposed by the law relating to tenancy by the entirety, and became entitled to hold and enjoy it absolutely as her own; and then, and then only, she acquired the power, not theretofore possessed, of disposing of the property by an exercise of her sole will. Thus the death of one of the parties became the "generating source" of important and definite accessions to the property rights of the other. These circumstances, together with the fact, the existence of which the statute requires, that no part of the property originally had belonged to the wife, are sufficient, in our opinion, to make valid the inclusion of the property in the gross estate which forms the primary base for measurement of the tax.

*Id.* at 503–504, 50 S.Ct. at 359.

As the *en banc* majority recognizes, it was the Supreme Court's later decision in *Riggs v. Del Drago*, 317 U.S. 95, 63 S.Ct. 109, 87 L.Ed. 106 (1942), which held "that Congress intended that the federal estate tax should be paid *out of the estate as a whole* and that the applicable state law as to the devolution of property at death should govern the distribution of the remainder and the ultimate impact of the tax." *Id.* at 97–98, 63 S.Ct. at 110 (emphasis added). The remainder referred to was what was left after calculation of the federal estate tax had been made. That case put to rest the question of whether a New York apportionment statute which spread the burden of federal estate tax among the beneficiaries of the estate was in conflict with federal estate tax law. Reading the *en banc* majority's opinion in the instant case, however, one would wrongly conclude that the influence of federal estate taxation on the common law of apportionment began and ended with *Del Drago*.

Quite to the contrary, however, there arose in the wake of *Del Drago* several discrete judicial and legislative responses to problems of apportionment. Some states, like Virginia, enacted apportionment statutes. Virginia's was enacted in 1946. Other states, even in the absence of such statutes and in the absence of will provisions to the contrary, created doctrines of equitable apportionment. Each of these responses, and its treatment of tenancy by the entireties property, is discussed below.

#### A. Equitable Apportionment

##### 1. No Will Provision

In the absence of a will provision addressing apportionment of federal estate taxes, there emerged a notable split in authority, with a majority view holding that equitable apportionment could reach the residuary estate only, and a minority view holding that such apportionment could reach the gross estate including non-pro-

the *en banc* majority does cite do not support its position.

bate property. An excellent discussion of the split in authority may be found in *In re Gallagher's Will,* 57 N.M. 112, 255 P.2d 317 (1953); and *Pearcy v. Citizens Bank & Trust Co.,* 121 Ind.App. 136, 96 N.E.2d 918, *reh. denied,* 121 Ind.App. 136, 98 N.E.2d 231 (1951).

### 2. Will Provision

Whatever split there may have been in the authorities regarding equitable apportionment when there was no will provision, such a split existed only in the absence of a specific will provision directing apportionment of federal estate taxes. Those authorities construing such testamentary directives—authorities speaking directly to the instant issue [2]—have consistently held that tenancy by the entireties property, and its community property analog, fall within the testator's power to apportion the tax burden among "his estate." [3]

Three of the leading cases on the point are *In re Gallagher's Will,* 57 N.M. 112, 255 P.2d 317 (1953); *In re Heringer's Estate,* 38 Wash.2d 399, 230 P.2d 297 (1951); and *Kershaw v. Kershaw,* 84 R.I. 429, 125 A.2d 126 (1956). In *Gallagher's Will,* the decedent had expressed his intent that if his wife chose to take her share of community property by law rather than accept the provisions made for her in his will, she was to receive no benefit from any of the provisions of that will. One of the provisions of the will directed that all estate taxes be paid out of the residue of the estate. Thus, because the wife elected against the will, she could not take advantage of the apportionment clause, with the result that her community and joint property became susceptible to payment of its portion of the estate taxes due. The question thus before the court was whether the public policy considerations underpinning community and joint property barred such apportionment.

The *Gallagher's Will* court began its analysis by noting that it was not deciding a case of equitable apportionment in the absence of a will provision. It then reviewed, in careful and comprehensive fashion, the history of apportionment through *Tyler, Del Drago,* and the split in authorities regarding equitable apportionment in the absence of will provisions. The court's citation to federal estate tax decisions of the Supreme Court poignantly illustrates the relationship—critical to our consideration of the instant issue—between the law of federal estate taxation regarding tenancy by the entireties property and the state law governing allocation of the resultant burden.

The Supreme Court of the United States ruled in response to these contentions [that only the decedent's half of his community estate could be taxed at death] that the power of Congress to impose death taxes is not limited to the taxation of transfers at death, but that it "extends to the creation, exercise, acquisition, or relinquishment of any power or legal privilege which is incident to the ownership of property." The court likened the situation to that where the tax had been upheld when measured by the entire interest on tenancies by the entirety and joint tenancies in *Tyler v. United States,* 1930, 281 U.S. 497 [50 S.Ct. 356, 74 L.Ed. 991] ... and *United States v. Jacobs,* 1939, 306 U.S. 363 [59 S.Ct. 551, 83 L.Ed. 763].... With respect to changes occurring in the interest of the wife in the community property upon the death of the husband, the court said

> "... the death of the husband of the Louisiana marital community not only operates to transfer his rights in his share of the community to his heirs or those taking under his will. It terminates his expansive and sometimes profitable control over the wife's share, and for the first time brings her half of the property into her full and

---

**2.** Reno's will, of course, contained a precise provision of apportionment to the one-time tenancy by the entireties property, freeing the Kentucky real estate of the liability for estate taxes.

**3.** Indeed, the only case I have found not so holding made its ruling on the basis of an explicit removal of such testamentary power by the Florida legislature, which has now been repealed. *See* n. 8, *infra.*

exclusive possession, control and enjoyment. The cessation of these extensive powers of the husband, even though they were powers over property which he never 'owned', and the establishment in the wife of new powers of control over her share, though it was always hers, furnish appropriate occasions for the imposition of an excise tax.

. . . .

"... It is enough that death brings about changes in the legal and economic relationships to the property taxed, and the earlier certainty that those changes would occur does not impair the legislative power to recognize them, and to levy a tax on the happening of the event which was their generating source."

*Id.* 255 P.2d at 320 (*quoting Fernandez v. Wiener,* 326 U.S. 340, 356–57, 66 S.Ct. 178, 186–87, 90 L.Ed. 116 (1945)).[4]

Although the rationale was addressed to community property concerns, the *Gallagher's Will* court recognized that the reasoning was equally applicable to joint interests, including tenancies by the entireties property. *Id.* 255 P.2d at 322–23 (*citing Heringer's Estate* and noting that Washington law treated community property as tenancy by the entireties property).

The court next recognized the meaning of *Del Drago* by noting,

> It was there definitely decided "that Congress intended that the federal estate tax should be paid out of the estate as a whole and that the applicable state law as to the devolution of property at death should govern the distribution of the remainder and the ultimate impact of the federal tax."

*Id.* 255 P.2d at 321 (*quoting Hooker v. Drayton,* 69 R.I. 290, 33 A.2d 206, 209 (1943)). Applying the teaching of *Del Drago* to the facts before it, the court stated,

> While the imposition of a tax measured by the surviving wife's share of the community is objectionable under our interpretation of community property law, *the tax has been imposed;* the determination of who shall finally bear the burden is left to the separate states. . . .

*Id.* 255 P.2d at 323 (emphasis added). After an exhaustive analysis of the split in authorities over the question of equitable apportionment in the *absence* of a will provision, *id.* 255 P.2d at 326–27, the court, quoting from *McDougall v. Central Nat. Bank of Cleveland,* 157 Ohio St. 45, 104 N.E.2d 441, 444 (1952), held

> The reasoning in [*Del Drago* ] indicates that there was no congressional intention which would operate as a reason against apportionment of the tax burden in part to nonprobate assets.

*Id.* 255 P.2d at 328. Perhaps the language most instructive in divining the true meaning of the words "my estate" in the instant case comes from the *Gallagher's Will* court's quotation from *Succession of Ratcliff,* 212 La. 563, 33 So.2d 114, 117 (1947):

> "... We think that the failure of counsel to discover the justice in requiring that the tax be shared proportionately by all emanates from their unwillingness to recognize that there is but one estate for federal taxation purposes and that the tax is levied on the whole, i.e.—the community and separate property. This being so, equitable principles demand that the burden be divided between all persons sharing in the estate in accordance with their respective interests. *There is*

---

**4.** Hence the power to measure the federal estate tax by including tenancy by the entireties property in the gross estate was fully established. Apportionment occurs at that level. As I shall further discuss, *infra,* the marital deduction does not encompass the amount apportioned by the testator's will to pay the taxes on the Kentucky real estate and hence, to that extent does not result in a change in beneficial ownership to the surviving spouse, Mrs. Reno. The change in ownership in the formerly tenancy by the entireties property, even for purposes of the net estate, occurs only partly 1) to the wife and partly 2) to payment of Kentucky real estate federal estate tax obligations. Only what she receives beneficially from her spouse qualifies for the marital deduction.

*no just way to apportion the tax burden by measuring it by different rates."*

*Id.* 255 P.2d at 329 (emphasis in original).

Although the case was decided before the creation of the federal marital deduction, the holding in *Gallagher's Will* clearly stands for the proposition that testamentary apportionment affecting nonprobate, community and tenancy by the entireties property, does not violate the policies underlying such property interests. The language, for our purposes here, could not be clearer: "It is universally recognized the testator has the right by his direction to make the federal estate tax payable from any portion of his estate he may designate." *Id.* 255 P.2d at 321.[5] Thus, the *Gallagher's Will* court felt itself on solid ground when it concluded that "the action of the lower court in apportioning to the appellant her pro rata share of the tax burden arising from the joint tenancy property is affirmed. Therefore, the rule is nonprobate assets includible in the gross taxable estate shall bear their proportionate share of the burden of the federal estate tax, subject, however, to the power of the testator to make other specific provision." *Id.* 255 P.2d at 328–29.[6]

The court in *In re Heringer's Estate* was even more to the point. In light of *Fernandez v. Wiener*, 326 U.S. 340, 66 S.Ct. 178, 90 L.Ed. 116 (1945), the court held,

> ... the basis of the tax [on the passing of community property to a spouse at the decedent's death, and notably treated as tenancy by the entireties property in Washington] is said to be the intangible benefits received by the survivor as a result of the dissolution of the community by death. This being the case, *we see no objection, from a public policy standpoint, to permitting the survivor's share to bear the burden of that tax where the testator inferentially indicates such a desire.*

230 P.2d at 302 (emphasis added). Here, of course, the testator's desires as to apportionment were far more than inferential. The will's freeing Kentucky real estate from the burden of federal estate tax inevitably shifted that burden to property which, until Reno's death, had been held as tenants by the entirety.

The question of testamentary power of apportionment over jointly held non-probate property was also squarely addressed by the Supreme Court of Rhode Island in *Kershaw v. Kershaw*. There, jointly held, non-probate real and personal property fell within the residuary estate, and it had been the decedent's direction that all taxes be paid out of that portion of his estate. The trustees protested, claiming that the jointly held property was not within the decedent's power to include in apportionment of estate taxes. The court responded as follows:

> The second question in substance related to whether there should be an apportionment of the estate and inheritance taxes on the money and property which stood jointly in the names of the testator and his son at the time of the testator's decease. These involved three joint bank accounts and certain jointly held real estate. They will be treated together since each presents the same legal problem and is governed by the same principle of law.
>
> It is our opinion from an examination of the whole will that the testator clearly intended that the burden of such taxes was to be borne entirely by the residuary estate. The language used to express this intention in clause Eleventh of the will is clear, comprehensive, and unambiguous, namely: "I direct that all legacy, inheritance, estate, and *all other taxes due from my estate* be paid out of the rest and residue of my estate." We know of no other meaning to be given such language which would reasonably carry out the expressed intention of the testator. No other provision qualifies that comprehensive direction.
>
> In the circumstances it is clear that regardless of who was entitled, upon the

---

5. Under the *en banc* majority's view, such "universal" recognition would 6350 35 11 come to an abrupt halt before entering into Virginia.

6. That statement makes clear that apportionment need not be *pro*portional if the testator has made other specific provision.

testator's death, to the jointly held property or how title thereto passed, such property was required by federal law to be included *for tax purposes* in the decedent's gross return. Consequently the taxes on such property clearly come within the testator's direction to pay "all other taxes due from my estate" as provided in clause Eleventh.

. . . .

In the instant case, the testator had an actual interest in the jointly held property up to the time of his death. Moreover the payment of taxes is not required on the ground that this property necessarily was within the true estate of the testator, that is, in the sense that such property would descend directly from him by operation of law if there was no will, or by virtue of the provisions of a will if he died testate. Rather it is because here the payment of taxes on such jointly held property is legally *due from his estate* and therefore such payment is dictated by the clear, unambiguous and comprehensive direction in clause Eleventh.

125 A.2d at 130–31 (emphasis in original).

### B. Apportionment Statutes

As noted above, the Commonwealth of Virginia enacted its apportionment statute in 1946, four years after *Del Drago* was decided. The relevant language of the various sections is treated at length in the panel majority opinion and need not be repeated here. But the point that bears repeating is that the language of the statute must be read in the context of the common law of apportionment in existence before and during the statute's enactment and the handing down of *Del Drago*. Thus, when the *en banc* majority concedes that the effect of section 64.1–165 is to treat *apportionment* as it existed at common law, the only conclusion to be drawn is that, at common law, the ability of the testator to extend apportionment of estate taxes to nonprobate property was consistently recognized, a fact unaltered by the language of the Virginia apportionment statute itself.

### C. The Marital Deduction

Because cases such as *Gallagher's Will* and *Heringer's Estate* were decided prior to the congressional creation of the marital deduction, the question arises as to what effect, if any, the creation of the deduction had on the common law power of a testator to make nonprobate property subject to apportionment of federal estate taxes.

As the Supreme Court pointed out in *United States v. Stapf,* 375 U.S. 118, 128, 84 S.Ct. 248, 255, 11 L.Ed.2d 195 (1963), *reh. denied,* 375 U.S. 981, 84 S.Ct. 477, 11 L.Ed.2d 428 (1964), Congress created the marital deduction in order to give common law states the advantage of "estate splitting" enjoyed by community property states. At the outset, then, it would seem that, under the logic of *Heringer's Estate,* which, in a community property state, allowed a decedent to reach his spouse's half of the community for apportionment purposes, the marital deduction, seeking to afford a common law spouse with a similar "half," would not stand as a bar to testamentary apportionment of federal estate tax to that half. The authorities bear that view out.

It is fairly settled that property qualifying for the marital deduction is free of equitable apportionment *in the absence of a contrary will provision* or in cases of intestacy. *Alexandria Nat'l Bank v. Thomas,* 213 Va. 620, 194 S.E.2d 723 (1973); *Seymour Nat'l Bank v. Heideman,* 133 Ind.App. 104, 178 N.E.2d 771 (1961).

Here there was such a contrary will provision, and, in such cases, the authorities make clear that property otherwise qualifying for the marital deduction is not free of a contrary will provision calling for apportionment. *Baylor v. Nat'l Bank of Commerce,* 194 Va. 1, 72 S.E.2d 282 (1952). *See also Wisely v. United States,* 893 F.2d 660 (4th Cir.1990). In upholding the power of a testator to direct apportionment of estate taxes against property otherwise completely covered by the marital deduction, the Supreme Court of Virginia noted in *Baylor* that, "[t]he Act of Congress imposing a tax upon the transfer of property from a dece-

dent and authorizing the marital deduction, did not change the applicable state law as to the devolution of property at death." *Id.* 72 S.E.2d at 285. In other words, by operation of section 64155 (now section 64.1–165) of the Virginia Code, the testator is free, just as he was at common law, to apportion the estate tax burden as he sees fit, even if such apportionment reduces the surviving spouse's benefit under the marital deduction.

The *en. banc* majority seeks to distinguish *Baylor* on the ground that the property covered by the marital deduction there was probate property and that the rule of *Baylor* cannot be extended to property passing outside of the will, especially property that was formerly tenancy by the entireties property. For a number of compelling reasons, the distinction will not withstand scrutiny.

First, as the Commissioner of Internal Revenue has pointed out, nothing in the language of the Virginia apportionment statutes suggests a limitation on testamentary power of apportionment vis-a-vis non-probate property. Section 64.1–160 of the Virginia Code provides that an "interested person" from whom the executor may, under section 64.1–162, recover estate taxes due, includes "all persons ... who may be entitled to receive or who have received *any property or interest which is required to be included in the gross estate of the decedent."* (Emphasis added). As discussed at length in the panel's majority opinion, the Internal Revenue Code, at the time of Reno's death, required 100% of the value of the Virginia non-probate property here involved to be included in the gross estate, thus explicitly establishing Mrs. Reno as such a person. 26 U.S.C. § 2040

(1976). *See also* 5 Bittner, *Federal Taxation of Income, Estates and Gifts,* ¶ 125.-11.6 at 125–57 (1984).

Second, the authorities cited by the *en banc* majority in support of its proposition that the language "my estate" cannot be construed, as a matter of law, to include tenancy by the entireties property, only address the issue in the context of probate versus non-probate property; that is, the power of a testator to *devise* or *bequeath* certain property which otherwise would pass outside of the will by operation of law. *Robinson v. Lee,* 205 Va. 363, 136 S.E.2d 860 (1964); *Stevens v. Sparks,* 205 Va. 128, 135 S.E.2d 140 (1964); *Johnson v. McCarty,* 202 Va. 49, 115 S.E.2d 915 (1960); *Awtry v. Commissioner,* 221 F.2d 749 (8th Cir.1955).[7] Those cases simply have nothing to do with the scope of a testator's power to apportion federal and state estate tax burdens, a power which, as discussed above, pre-dates the Virginia legislature's enactment of its apportionment statute and Congress' creation of the marital deduction.

Had the *en banc* majority given effect to authorities such as *Heringer's Estate, Kershaw* and *Gallagher's Will,* whose jurisdictions had directly addressed the apportionment question, the decision would have been otherwise.[8] Those jurisdictions, among others, have consistently recognized the power of a testator to direct apportionment of federal estate taxes among both probate and non-probate property, whether the non-probate property comprised *inter vivos* gifts in contemplation of death, joint tenancies, or tenancy by the entireties property, and have consistently ruled that such property clearly falls within the "my

---

**7.** And as the panel's majority opinion points out, the other tenancy by the entireties cases cited by the estate have even less to do with the apportionment question. *See In re Bishop,* 482 F.2d 381 (4th Cir.1973); *In re Kline,* 370 F.Supp. 152 (W.D.Va.1973); *In re Saunders,* 365 F.Supp. 1351 (W.D.Va.1973); *Vasilion v. Vasilion,* 192 Va. 735, 66 S.E.2d 599 (1951).

**8.** The estate itself has implicitly conceded that the Virginia authorities neither address nor resolve the issue by citing *In re Barret's Estate,* 137 So.2d 587 (Fla.App.1962) as the sole support of

its contention that a testator has no power of apportionment over non-probate property. Significantly in *Barret's Estate,* however, the Florida legislature had specifically removed, by statute, the power of the testator to reach non-probate property through apportionment. When the Florida legislature later repealed the statute, rendering Florida's apportionment scheme once more compatible with Virginia's, that power was fully restored. *Pfeifer v. Varner,* 452 So.2d 622, 54 A.F.T.R.2d 6483 (Fla.App. 1984).

estate" language for apportionment of estate tax purposes. The property after all has, upon Reno's death, ceased to be owned by anyone but Mrs. Reno, but includability in the gross estate and apportionability flow, not from tenancy by the entireties status, but because of the contingent fee simple interest Reno owned up until his death that terminated only because his death preceded hers. And the rule has been extended to the marital deduction.

In *Merchants Nat'l Bank & Trust Co. v. United States*, 246 F.2d 410 (7th Cir.), *cert. denied*, 355 U.S. 881, 78 S.Ct. 148, 2 L.Ed.2d 112 (1957), the Seventh Circuit, faced with circumstances markedly similar to the instant facts, upheld a testator's direction that his residuary estate bear the burden of all federal estate taxes due, even though such direction resulted in apportionment of taxes against property passing to the surviving spouse outside of the will as tenancy by the entireties property and a consequent diminution of her marital deduction. The court specifically held,

> The language of testator's direction ... pertaining to the payment of federal estate and state inheritance and estate taxes "that may be assessed upon my estate or payable by any beneficiary thereof on account of the provisions hereof made in their behalf ...", includes, not only that property which the testator intended to transmit by his will, but also such property as the insurance policies involved in this case, and intestate estate [including tenancy by the entireties property]. It can hardly be denied that intestacy embraces not only property which the decedent failed to mention in his will but also that property which passed as intestate upon the widow's renunciation of the provisions made in the will for her. All of this property— life insurance, property passing by the will, and property passing under the laws of intestacy of Indiana—was subject to federal estate taxes. As to all of these classes of property the duty devolved upon the executor, by virtue of [the will provision], to pay the federal estate and state inheritance taxes because they were assessed upon the decedent's estate. Accordingly they were paid by the executor. *In so doing it was required of it that such payments be made "from and out of my residuary estate."*

. . . .

> We, therefore, determine, pursuant to Indiana law, that the ultimate impact of the federal estate tax fell on the residuary estate, including the part of the estate passing to the widow as intestate property, and the insurance policies. The effect thereof is to reduce the marital deduction herein to $280,933.55. It follows therefore that the claim for refund was properly rejected.

*Id.* at 413, 415 (emphasis added) (footnote omitted).

We see, then, following the logic of *Gallagher's Will, Heringer's Estate*, and *Kershaw*, that *Merchants National Bank* is the natural extension of the rule enunciated in *Baylor*. In other words, contrary to the assertions of the *en banc* majority, there is no justification for distinguishing *Baylor* on the ground that it did not concern the apportionment of federal estate tax to part of the gross estate consisting of non-probate property. As that case, along with *Gallagher's Will, Heringer's Estate*, and *Kershaw*, makes clear, testamentary apportionment is not bounded by an artificial probate/non-probate distinction. Indeed, the *en banc* majority have not pointed to *any* language in the federal or Virginia statutes drawing such a distinction.

The *en banc* majority's distinction without a difference is further illustrated by those authorities upholding the power of a testator to subject other nonprobate property to estate tax. In *In re Estate of Sheets*, 331 N.W.2d 127, 129 (Iowa 1983), the Supreme Court of Iowa held that Iowa's apportionment statute clearly permitted a testator to shift the federal estate tax burden from probate assets to nonprobate assets; specifically, to *inter vivos* gifts made in contemplation of death. And in *United States v. Goodson*, 253 F.2d 900 (8th Cir.1958), the Eighth Circuit, in permitting a testator to burden nontestamentary gifts with federal estate taxes, held,

Where the Government by its tax statutes has a constitutional right to tax as part of the gross estate certain property not passing by will, it does not seem unreasonable to permit the testator to provide by his will that the pro rata share of the tax, imposed by reason of the inclusion of such nontestamentary property in the gross estate subject to tax, shall be borne by the beneficiaries of nontestamentary gifts.

*Id.* at 905. Surely, if a testator has the power to burden property, to which, at the time of his death, he held *no* title, with federal estate taxes, he has the power to apportion federal estate taxes to property in which he shared title, while living, as a tenant by the entireties.

Each of the authorities cited, from *Gallagher's Will* to *Goodson*, stands in direct opposition to the *en banc* majority's assertion that the term "my estate" is not coextensive with "gross estate" for estate tax purposes, and draws the very important distinction that both the estate and the *en banc* majority fail to draw: the Virginia common law of tenancy by the entireties affects the definition of "my estate" only in the context of the power to devise or bequeath probate assets. It does not apply in the context of testamentary power to apportion federal estate taxes.

Had the *en banc* majority given effect to the authorities set forth above, it would not have been able to conclude that section 64.1–165 of the Virginia Code does not bestow "a power to disproportionately impair a surviving spouse's interest in property held by the entireties." Indeed it does.

In sum, the effect of section 64.1–165, as the *en banc* majority has treated it, is to treat the question of apportionment as if the statutory apportionment scheme did not exist; in other words, to return to the pre–1946 common law. And as the history of the common law on the matter demonstrates, the power of a testator to direct the apportionment of federal estate taxes to include tenancy by the entirety property and to diminish, to the extent of the apportioned taxes, the marital deduction is widely recognized.

It is also to be observed that such diminution was explicitly sought by a provision of Reno's will, a recognized and nurtured objective. *See Wisely v. United States,* 893 F.2d at 665. The probate estate includes the Kentucky real estate and is amply sufficient to meet the federal estate tax here in issue. The tax, having first been calculated, it is a matter of indifference to the federal fisc whether the executor chooses to meet it from that probate property or property which formerly had enjoyed tenants by the entireties status. It would clearly more exactly fit Reno's testamentary expression to choose what once had been tenancy by the entireties property, but whichever choice the executor makes, the tax remains the same. As the *Gallagher's Will* court observed,

> [The federal estate tax statute] did not undertake in any manner to specify who was to bear the burden of the tax. Its legislative history indicates clearly that Congress did not contemplate that the Government would be interested in the distribution of the estate after the tax was paid, and that Congress intended that state law should determine the ultimate thrust of the tax.

255 P.2d at 328.

History has been overlooked by the *en banc* majority. For that reason, as well as for the reasons set forth in the vacated majority panel opinion, I respectfully dissent.

ERVIN, Chief Judge, and PHILLIPS, WILKINSON and NIEMEYER, Circuit Judges, join in this dissent.